DA 09-0633

## IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2010 MT 132

ANDY GRIFFIN, Individually and as
Personal Representative of the Estate of
CARLA GRIFFIN,

       Plaintiff and Appellant,

   v.

JOHN MOSELEY, M.D.,

       Defendant and Appellee.

APPEAL FROM:    District Court of the Thirteenth Judicial District,
               In and For the County of Yellowstone, Cause No. DV 2006-0457
               Honorable Susan P. Watters, Presiding Judge

COUNSEL OF RECORD:

       For Appellant:

              Torger Oaas, Attorney at Law, Lewistown, Montana

              Jon A. Oldenburg, Attorney at Law, Lewistown, Montana

       For Appellee:

              John J. Russell, Lisa A. Speare, Brown Law Firm, Billings, Montana

                     Submitted on Briefs:  April 14, 2010

                             Decided:  June 8, 2010

Filed:

           _____
                      Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1     Appellant Andy Griffin appeals from a grant of summary judgment in the Thirteenth Judicial District Court, as well as an order denying leave to amend his complaint. We reverse the grant of summary judgment, and remand the order denying leave to amend to the District Court for further proceedings consistent with this Opinion.

## FACTUAL AND PROCEDURAL BACKGROUND

¶2     In 2003, Carla Griffin (Carla) was suffering from a condition known as pseudotumor cerebri (PTC). PTC can cause headaches and vision loss. PTC generally affects obese women during their child-bearing years, and can be treated by ophthalmologists, neurologists, and neurosurgeons. One method for treating PTC consists of implanting a lumbar peritoneal shunt in the patient's lumbar subarachnoid space to divert excess cerebral spinal fluid, thereby reducing pressure on the optic nerve. This shunt surgery is performed by neurosurgeons. Other conservative medical treatments are also available for treating PTC. These include the use of weight loss regimens in combination with pharmaceutical drugs. These more conservative treatments do not require surgery.

¶3     Carla had been referred by Dr. Frances Saboo, an optometrist at Crow Agency, Montana, to Dr. Roger Williams, a Billings, Montana, neurologist, for an evaluation of her PTC. Dr. Williams confirmed Carla's PTC diagnosis and referred her to Dr. John Moseley, a neurosurgeon, for a consideration of the shunt surgery. Dr. Moseley saw Carla on March 26, 2003. Dr. Moseley recommended that Carla undergo the shunt surgery. In a letter written to Dr. Williams after his visit with Carla, Dr. Moseley stated

2

that he had discussed the associated risks of the surgery including chronic low pressure headaches and subdural hematomas, but also stated these risks were probably minimal when compared to Carla's daily severe headaches and risk of further change in vision.

¶4 On May 7, 2003, Dr. Moseley performed the shunt surgery on Carla. Prior to surgery, Dr. Moseley had Carla sign an informed consent form describing some of the risks of the surgery. The informed consent form did not list weight loss and the administration of pharmaceutical drugs such as Lasix as alternative treatments for PTC.

¶5 When Carla awoke from her surgery, she was suffering from severe leg pain. It was subsequently discovered that the placement of some tubing used during the surgery was likely causing the pain. Dr. Moseley performed follow-up surgery on May 9, 2003, and pulled the tubing back several inches. However, Carla's leg pain never went away, and she was later determined to be totally disabled from work. Carla spent the next six years in and out of hospitals and took powerful prescription pain medication for her leg pain. On March 10, 2009, Carla died from complications related to her pain medication.

¶6 In May 2006, prior to her death, Carla and her husband Andy (Griffins) filed a negligence suit against Dr. Moseley.[1] On January 30, 2007, the Griffins filed a first amended complaint. The amended complaint contains the following counts against Dr. Moseley:

> [Count I] The actions of Carla Griffin's treating physician, John Moseley, M.D., constitute a deviation from [the] accepted standard of care and constitute negligence which has caused the injuries to Carla Griffin as described above.

---

[1] The Griffins also filed claims against Medtronic, Inc., the manufacturer of the shunt used in her operation.

[Count II] Carla Griffin's treating physician, John Moseley, M.D., failed to fully inform Carla Griffin about the known risks associated with the placement of a lumbar peritoneal shunt and therefore did not properly obtain her consent for surgery.

¶7 The parties engaged in discovery after the filing of the complaint. One of the Griffins' expert witnesses, Dr. Patrick E. Galvas, who is not a neurosurgeon, opined that Carla had suffered a nerve injury during the surgery. In deposition testimony, Dr. Moseley acknowledged that nerve damage was a risk of shunt implementation.

¶8 On April 14, 2009, the Griffins filed an expert disclosure for Dr. Kenneth Houchin, a neuro-ophthalmologist. Dr. Houchin opined that proceeding to surgery for Carla's PTC before attempting to relieve her symptoms through less invasive means, such as weight loss and medication, would constitute a breach of the standard of care for the treatment of PTC. In his expert disclosure, Dr. Houchin stated as follows:

An opinion on the neuro-surgical technique utilized and/or the informed consent process for the lumbar peritoneal shunt would best be deferred to an expert in neuro-surgery.

Although weight loss is considered the definitive treatment for benign intracranial hypertension,[2] at no time is a discussion documented in the medical record advising weight loss or offering medical assistance in achieving weight loss. Thus, supervised weight loss with minimal risk was apparently never tried before proceeding with lumbar peritoneal shunt with its associated significant risks.

Proceeding to lumbar peritoneal shunt without first offering the patient medically-supervised weight loss falls below the standard of care in the management of benign intracranial hypertension.

Furthermore, the diuretic Lasix may be used in a patient that can not tolerate Diamox or corticosteroids to lower the cerebral spinal fluid pressure and ameliorate symptoms. No documentation is present that Lasix

---

[2] Benign intracranial hypertension is another name for PTC.

was tried. Thus, an adequate well-supervised trial of Lasix with minimal risk was apparently never tried before proceeding with lumbar peritoneal shunt with its associated significant risks.

Proceeding to lumbar peritoneal shunt without first giving an adequate trial of Lasix falls below the standard of care in the management of benign intracranial hypertension.

¶9 On May 19, 2009, the Griffins deposed Dr. Moseley who admitted that he did not discuss any forms of alternative treatment with Carla prior to obtaining her consent for surgery. In light of this information, Griffins moved to amend Count II of their complaint on May 29, 2009. The Griffins argued that Dr. Moseley's admission constituted evidence that Dr. Moseley violated the standard of care with respect to informed consent. In their brief in support, the Griffins argued that their claims against Dr. Moseley were based on three sets of facts: (1) lack of informed consent by failing to disclose the known risks of shunt surgery; (2) medical negligence in proceeding to surgery for PTC before attempting less invasive treatments for PTC, such as weight loss and Lasix therapy; and (3) medical negligence in the placement of the shunt. In light of Dr. Moseley's testimony, the Griffins sought leave to amend Count II of their complaint on June 2, 2009, to add allegations that informed consent was ineffective for failure to inform Carla of alternative treatments for PTC.

¶10 On June 1, 2009, Dr. Houchin was deposed by defense counsel. In his deposition, Dr. Houchin was asked by counsel about the extent of his medical expertise in treating PTC. Dr. Houchin stated that he has treated hundreds of patients for PTC. His treatment regimen consisted of the use of Lasix and other weight loss alternatives. The doctor testified that referral for neurosurgery was discussed only if the conservative treatment

5

measures failed, but that only 10% or less of his patients failed to respond to alternative treatment measures. Dr. Houchin testified that the standard of care required Dr. Moseley to recommend such conservative measures.

¶11 On June 5, 2009, Dr. Moseley moved for summary judgment on the Griffins' claims, contending that the Griffins did not have expert testimony to support their claims that he violated the standard of care. Dr. Moseley argued that Dr. Houchin was their only expert on liability and he could not offer an opinion to support their claims because he was an ophthalmologist, and not a board-certified neurosurgeon like Dr. Moseley.

¶12 A hearing on the summary judgment motion was scheduled for July 1, 2009. However, the Griffins had already scheduled a deposition in Portland, Oregon, on that date for Dr. Edmund Frank, one of Dr. Moseley's expert witnesses and a board-certified neurosurgeon. After Dr. Moseley's counsel informed the Griffins that the deposition could not be rescheduled, the Griffins asked the District Court to reschedule the hearing. The District Court then reset the hearing for June 29, 2009, two days before Dr. Frank's deposition. The summary judgment was argued as scheduled.

¶13 In his deposition taken two days after the summary judgment hearing, Dr. Frank testified that the standard of care for informed consent required discussion of alternative weight loss treatment before attempting surgery. Based upon this testimony, the Griffins filed a supplement to their response to Dr. Moseley's summary judgment motion with this additional information from Dr. Frank's deposition.

¶14 On October 23, 2009, the District Court entered two written orders. The first order granted Dr. Moseley's motion for summary judgment and rejected the Griffins'

6

supplemental response to this motion. The second order denied the Griffins' motion to amend their complaint.

¶15 With respect to the motion for summary judgment, the District Court first concluded it did not have the discretion to accept the Griffins' supplemental response, noting that the Griffins did not seek leave of court to file a supplemental response brief, and that in the absence of such leave the additional brief would not be allowed under the Montana Rules of Civil Procedure or the Uniform District Court Rules.

¶16 Turning then to the merits of the summary judgment motion, the District Court agreed with Dr. Moseley that the Griffins' complaint contained only two claims against him: (1) negligence during the performance of the surgery; and (2) failure to obtain informed consent prior to surgery. The District Court concluded that the complaint did not state a claim for failure to exhaust non-surgical therapies before attempting surgery, and stated that it would consider only the two allegations set forth in the existing complaint.

¶17 The District Court then concluded that the Griffins could not meet their burden of proof regarding the standard of care to be applied to the performance of the surgery and the failure to obtain informed consent prior to surgery. Noting that the Griffins' only expert witness, Dr. Houchin, was an ophthalmologist, and not a board-certified neurosurgeon like Dr. Moseley, the District Court concluded that Dr. Moseley was entitled to judgment as a matter of law under *Mont. Deaconess Hosp. v. Gratton*, 169 Mont. 185, 545 P.2d 670 (1976), because the Griffins could not provide the requisite testimony that Dr. Moseley violated the applicable standard of care.

7

¶18 In its second order, the District Court denied Griffins' motion to amend their complaint. The Court premised its denial of the motion to amend upon its summary judgment order. As stated by the District Court:

> The First Amended Complaint set forth two claims against Defendant: (1) negligence during the performance of surgery; and (2) failure to obtain informed consent prior to surgery. *Pl.'s First Amended Complaint and Jury Demand* 2 (Jan. 30, 2007). If the amendment were allowed, the Second Amended Complaint would still only set forth those same two claims against Defendant. Plaintiff's proposed amendment, rather than setting forth a new cause of action, simply adds a new set of facts under which Plaintiff alleges Defendant failed to obtain informed consent prior to surgery. *See Pl.'s Br. in Supp. of Pl.'s Mot. For Leave to File Pl.'s 2nd Amended Comp.* 3 (June 2, 2009) (stating that Defendant failed to obtain informed consent prior to surgery because he did not disclose other available treatment choices). The Court has found that these two claims do not survive summary judgment. *See Order Granting Def.'s Mot. S.J. and Denying Pl.'s Mot. to Supplement Pl.'s Resp. to Def.'s Mot. S.J. and Denying Pl.'s Mot. to Supplement Pl.'s Resp. to Def.'s Mot. S.J.* 8 (October 23, 2009). Therefore, the Court holds that Plaintiff's motion should be denied because allowing the amendment would be futile.

Accordingly, the District Court denied the motion for leave to amend.

¶19 The Griffins now appeal from these two orders. We state the issues presented by the Griffins' appeal as follows:

¶20 **Issue One:** *Did the District Court abuse its discretion in denying the Griffins leave to amend their complaint?*

¶21 **Issue Two:** *Did the District Court err in granting summary judgment?*

## STANDARD OF REVIEW

¶22 M. R. Civ. P. 15(a) of the Montana Rules of Civil Procedure states that leave to amend should be freely given by the district courts. *Upky v. Marshall Mtn., LLC*, 2008 MT 90, ¶ 18, 342 Mont. 273, 180 P.3d 651. While amendments are not permitted in

8

every circumstance, they may be allowed when they would not cause undue prejudice to the opposing party. *Upky*, ¶ 18. We generally review a district court's decision denying leave to amend for an abuse of discretion. *Deschamps v. Treasure State Trailer Court, Ltd.*, 2010 MT 74, ¶ 18, 356 Mont. 1, ___ P.3d ___. As we recently stated in *Deschamps*, "[a]lthough leave to amend is properly denied when the amendment is futile or legally insufficient to support the requested relief, it is an abuse of discretion to deny leave to amend where it cannot be said that the pleader can develop no set of facts under its proposed amendment that would entitle the pleader to the relief sought." *Deschamps*, ¶ 18 (quotation omitted). The only exception to this abuse of discretion standard of review arises in cases where the district court's decision is rendered pursuant to M. R. Civ. P. 15(c), which addresses the relation back of amendments; in such cases, we review the legal question presented de novo. *Deschamps*, ¶ 19 (discussing *Citizens Awareness Network v. Mont. Bd. of Envtl. Rev.*, 2010 MT 10, 355 Mont. 60, 227 P.3d 583).

¶23 We review a district court grant of summary judgment de novo, applying the same standards as the district court pursuant to M. R. Civ. P. 56. *Signal Perfection, Ltd. v. Rocky Mtn. Bank - Billings*, 2009 MT 365, ¶ 9, 353 Mont. 237, 224 P.3d 604. Under M. R. Civ. P. 56(c), summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

## DISCUSSION

¶24   **Issue One:** *Did the District Court abuse its discretion in denying the Griffins leave to amend their complaint?*

¶25   The Griffins argue that the District Court abused its discretion when it denied them leave to amend Count II of their complaint to add allegations that Dr. Moseley did not have Carla's informed consent since he failed to advise her of alternatives to the shunt surgery. In order to place this question in the proper context, we must look to the predicate order of summary judgment.

¶26   In opposing the motion for summary judgment, the Griffins argued that Count I of their existing complaint did encompass a claim against Dr. Moseley for negligently proceeding to surgery without first exhausting the medical therapies of weight loss and medication. In the motion to amend they argued that their proposed amendment to Count II of their complaint would add a cognizable claim for lack of informed consent about alternatives to surgery. However, the District Court found no allegation of negligent pre-surgical treatment in Count I, and further refused to consider any allegation that Dr. Moseley breached the standard of care for informed consent by failing to inform Carla of alternatives to surgery. Then, because the District Court concluded that Dr. Houchin could not offer an expert opinion on whether Dr. Moseley violated the neurosurgical standard of care with respect to the surgery or informed consent thereon, it granted Dr. Moseley's motion for summary judgment.

¶27   The District Court denied the motion to amend on the grounds that the Griffins' proposed amendment would be futile since the amended claim, if allowed, would still be defeated on summary judgment. The District Court noted that the Griffins' proposed

amendment would not add a new cause of action, but would instead simply add a new set of facts to the claim that Dr. Moseley failed to obtain informed consent prior to surgery. The District Court had already found these claims would not survive summary judgment due to the Griffins' failure to provide expert testimony on the standard of care. The District Court therefore concluded that an amendment would be futile.

¶28 It is important to note in this procedurally confusing case that Griffins' motion to amend their complaint was filed **before** Dr. Moseley's motion for summary judgment was filed. The Griffins sought to add an allegation to Count II of their complaint to clarify that their claim for violation of the standard of care for informed consent was premised on two grounds. The first ground—that Dr. Moseley failed to inform Carla of the risks of the surgery—was already set forth in the complaint. The second ground which they sought to add was that informed consent was lacking because Dr. Moseley did not discuss alternative treatments for PTC with Carla. However, because the District Court addressed the summary judgment motion before it addressed the motion to amend, it considered only the informed consent with respect to the risks of surgery, and not the informed consent with respect to alternative treatments for PTC. Herein lies the problem: the court premised its denial of the motion to amend upon its order of summary judgment, when it should have first considered the prior-filed motion to amend under M. R. Civ. P. 15, and then addressed the summary judgment motion in the context of its ruling on the motion to amend.

¶29 As noted above, leave to amend should be freely given absent prejudice to the opposing party. *Upky*, ¶ 18. We conclude that the order denying the motion to amend

11

Count II must be reversed because it was premised upon the order of summary judgment. We therefore remand this matter to the District Court for evaluation of the motion to amend on its own merits. On remand, the District Court will have the opportunity to exercise its discretion under M. R. Civ. P. 15 in deciding whether to allow the Griffins to add allegations to the informed consent claim in Count II, and the opportunity to issue an order explaining its rationale for granting or denying leave to amend.

¶30 Before leaving this issue, it is likely that in determining whether to grant leave to amend, the District Court will be faced with the argument that leave to amend should be denied because Dr. Houchin cannot in any event provide the requisite expert testimony on the standard of care to be exercised by a neurosurgeon securing informed consent from his patient. Because this issue has been fully briefed by the parties, and in the interests of judicial efficiency, we will resolve this issue here and now. Should the court grant leave to amend on remand, this resolution will be useful; should the court deny leave to amend, it will be moot.

¶31 It is clear that Dr. Houchin, as a neuro-ophthalmologist, is not qualified to render an expert opinion on whether Dr. Moseley violated the standard of care in performing the shunt operation, or in advising Carla on the risks of the surgery itself. He conceded as much himself. The question is whether Dr. Houchin has the expertise to render an expert opinion on the standard of care for informed consent in relation to the disclosure of alternatives to PTC surgery. In *Gratton*, this Court stated that a plaintiff has the burden in a medical malpractice case of presenting evidence on the medical standard of care "by expert medical testimony unless the conduct complained of is readily ascertainable by a

12

layman." *Gratton*, 169 Mont. at 189, 545 P.2d at 672. Failure to present such evidence is fatal to the plaintiff's claim. *Gratton*, 169 Mont. at 190, 545 P.2d at 673.

¶32 A review of Dr. Houchin's expert disclosure and his deposition testimony demonstrates a sufficient basis for Dr. Houchin to render expert testimony on the standard of care for informed consent as it pertains to alternatives to the PTC surgery. In his expert disclosure, Dr. Houchin described the alternative methods for treating PTC which he routinely uses with his patients. Dr. Houchin stated that he has treated hundreds of patients for PTC, using a regimen consisting of the use of Lasix and other weight loss alternatives. Dr Houchin stated that a referral for neurosurgery is done only if the conservative treatment measures fail, and that in roughly 90% of his cases, his patients respond to such alternative measures. Furthermore, Dr. Houchin specifically opined in his deposition that Dr. Moseley violated the standard of care for informed consent by failing to discuss these alternative treatments with Carla. The sufficiency of Dr. Houchin's opinion was later confirmed by the deposition testimony of Dr. Frank, who opined that a discussion of the types of PTC treatments routinely performed by Dr. Houchin constitutes a portion of the standard of care of the informed consent process for a neurosurgeon performing PTC surgery.

¶33 Under these circumstances, we conclude that Dr. Houchin is qualified to render an opinion on whether a neurosurgeon should discuss alternative treatments for PTC prior to attempting surgery. There is no absolute requirement under Montana law that a physician must be a neurosurgeon in order to testify as to that aspect of the informed consent process for the treatment of PTC which is within his area of expertise. *See Glover v.*

13

*Ballhagen*, 232 Mont. 427, 429, 756 P.2d 1166, 1168 (1988) (citing *Hunsaker v. Bozeman Deaconess Found.*, 179 Mont. 305, 588 P.2d 493 (1978)) ("We [have] not declare[d], as a matter of law, that doctors practicing in the same specialty were the only ones who could testify as to that standard of care. For example, in the past we have allowed a general practitioner to testify as to the standard of care required of a specialist.").

¶34 Based upon the foregoing, in its reconsideration of the motion to amend, the District Court should not assume that the amendment would be futile, as Dr. Houchin's testimony would be sufficient on that aspect of the informed consent dealing with the obligation to address alternative conservative therapies before attempting surgery. In so holding, however, we do not imply that the District Court is therefore bound to grant the motion to amend, as it must still exercise its discretion under M. R. Civ. P. 15.

¶35 **Issue Two:** *Did the District Court err in granting summary judgment?*

¶36 Because we have concluded that the District Court abused its discretion in the manner in which it denied leave to amend Count II of the complaint, we must vacate the order of summary judgment as it pertains to Count II of the complaint. The District Court must first determine the scope and nature of the allegations in the complaint before it is in a position to ultimately grant or deny summary judgment on Count II. However, we must still resolve a second issue briefed by the parties, which is whether the court erred in granting summary judgment on Count I of the Griffins' complaint (for which no amendment was sought). Plaintiffs argued that Count I, as pled, was sufficient to encompass the allegation that Dr. Moseley breached the standard of care by proceeding to

14

shunt surgery without first exhausting the medical therapies of weight loss and medication. The District Court rejected this argument, finding no such textual allegation in the complaint, and entered summary judgment.

¶37 Count I of the complaint alleges generally that the actions of Dr. Moseley deviated from the standard of care and constituted negligence. *See Opinion*, ¶ 6. The Griffins contend that this claim encompasses negligence in pre-surgical as well as surgical care. As noted above, Dr. Houchin stated that the conservative measures are part of his treatment regimen prior to a referral to a neurosurgeon. Additionally, Dr. Michael Power, a defense expert and ophthalmologist, also testified during his deposition that he treats PTC with conservative management measures. Relying on *Gonzalez v. Walchuk*, 2002 MT 262, 312 Mont. 240, 59 P.3d 377, the Griffins argue that because this issue has been raised in depositions, Dr. Moseley is on notice that his alleged negligence encompassed both the surgical and pre-surgical treatment of Carla's condition. The Griffins argue that the District Court construed the allegations in Count I too narrowly when it held that Dr. Moseley's alleged negligence did not encompass pre-surgical treatment, such notice notwithstanding.

¶38 In *Gonzalez*, this Court noted that:

> It is well settled that "a complaint must put a defendant on notice of the facts the plaintiff intends to prove; the facts must disclose the elements necessary to make the claim; and the complaint must demand judgment for the relief the plaintiff seeks." *Larson v. Green Tree Financial Corp.*, 1999 MT 157, ¶ 35, 295 Mont. 110, ¶ 35, 983 P.2d 357, ¶ 35 (citation omitted). The complaint must provide a defendant with notice and an opportunity to defend himself. *Larson*, 1999 MT 157 at 35.

*Gonzalez*, ¶ 13.

We reversed the District Court's order of summary judgment, concluding that while fraud allegations were not included in the complaint, the defendants had notice of these allegations based both on the contents of the complaint *and* the issues raised and litigated during discovery, and that therefore summary judgment was improperly granted. *Gonzalez*, ¶ 17.

¶39 The same result is compelled here. Count I alleged that Dr. Moseley was negligent and that his actions fell below the standard of care. This count did not specifically allege that Dr. Moseley's negligence encompassed his failure to attempt alternative pre-surgical treatment. However, the doctor was clearly on notice of this aspect of the plaintiffs' case. Even setting aside consideration of Dr. Frank's testimony,[3] the deposition testimony of Drs. Houchin and Power put Dr. Moseley on notice that the plaintiff maintained he was negligent in both his surgical treatment of Carla, as well as in his pre-surgical treatment of her. Therefore, we conclude the District Court construed Count I too narrowly when it concluded that the negligence allegations were confined solely to the surgical procedures in this case. As this Court stated in *Spaberg v. Johnson*, 143 Mont. 500, 392 P.2d 78 (1964),

> "[A] ll the Rules require is 'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests. The illustrative forms appended to the Rules plainly demonstrate this. Such simplified 'notice pleading' is made possible by the liberal opportunity for discovery and the other pre-trial

---

[3] Dr. Frank's testimony was not considered by the District Court when it granted summary judgment. Dr. Frank testified that the conservative treatment methods, which were discussed by Drs. Houchin and Power in their depositions, were part of the standard of care for the treatment of PTC.

16

procedures established by the Rules to disclose more precisely the basis of both claim and defense and to define more narrowly the disputed facts and issues."

*Spaberg*, 143 Mont. at 503, 392 P.2d at 80 (quoting *Conley v. Gibson*, 355 U.S. 41, 47-48, 78 S. Ct. 99, 103 (1957)). Accordingly, we reverse the entry of summary judgment on Count I of the plaintiff's complaint.

## CONCLUSION

¶40 We conclude that the District Court abused its discretion in the fashion in which it denied leave to amend, and remand for reconsideration in a manner consistent with this Opinion. Furthermore, we reverse in part and vacate in part the order of summary judgment. We reverse summary judgment on Count I, and remand the summary judgment order with respect to Count II for reconsideration after the court resolves the motion to amend the complaint pursuant to M. R. Civ. P. 15.


/S/ PATRICIA O. COTTER


We concur:

/S/ MIKE McGRATH
/S/ W. WILLIAM LEAPHART
/S/ MICHAEL E WHEAT


Justice Jim Rice, dissenting.

¶41 I disagree with the Court's conclusion regarding Dr. Houchin's ability to testify regarding the standard of care applicable to neurosurgeons. The Court recognizes that

17

Dr. Houchin was <u>not</u> qualified to render an expert opinion regarding the standard of care governing a board-certified neurosurgeon's obtaining a patient's *informed consent about the risks of the surgery itself*. *See* Opinion, ¶ 31. Nonetheless, the Court determines that Dr. Houchin <u>was</u> qualified to render an expert opinion regarding the standard of care governing a board-certified neurosurgeon's obtaining a patient's *informed consent about alternatives to PTC surgery*. *See* Opinion, ¶ 33. I do not believe the distinction the Court has made between these subcomponents of informed consent is viable. Both are part of the patient's giving of consent to the neurosurgeon for surgery, and are obtained in a singular process. As Dr. Houchin acknowledged, "An opinion on the neuro-surgical technique utilized and/or *the informed consent process* . . . would best be deferred to an expert in neuro-surgery." (Emphasis added.)

¶42    This is further illustrated by the deposition testimony regarding the respective qualifications and duties of the practitioners involved in this case. Dr. Houchin is not board-certified in neurology, has not been trained in neurosurgery, and does not perform the surgery at issue in this case. Dr. Houchin is a neuro-opthamologist who is an expert on *alternative* (nonsurgical) treatment of PTC. As the Court notes, Dr. Houchin testified that 90% of his patients respond to alternative treatment of PTC, and he refers them for neurosurgery "*only if* the conservative treatment measures fail." Opinion, ¶ 32 (emphasis added). By Dr. Houchin's admission, *all patients* who are referred by him for neurosurgery have already tried alternative treatment, and have failed to obtain relief. At that point, his practice and expertise have ended, and the patient is placed in the hands of the neurosurgeon.

¶43   Dr. Frank's deposition testimony confirmed this assessment.  Under questioning by Griffins' counsel about a neurosurgeon's standard of care, he testified as follows:

> Q.   Before neurosurgeons in general would agree to operate or use a surgical option, there would have to be some sort of work or inquiry as to whether or not medical treatment had been tried on a particular patient and didn't work, and that's the reason that they were referred for surgery?
>
> A.   Well, the referral for surgery would imply that medical treatment— conservative treatment had failed.
>
> .   .   .
>
> Q.   What would you do in a situation where the records from her referring physician were silent as to whether or not medical therapy had been tried? . . .
>
> A.   As I also said before, I believe, that we would get a referral from someone that was a neurologist or a neuro-ophthalmologist, *which would mean that they have exhausted the conservative treatment, which is their area of expertise.*  A cover letter often does not include everything that has been done.  [Emphasis added.]

¶44   Dr. Frank thus agrees with Dr. Houchin's practice on this point—that patients are not referred to neurosurgeons until they have already exhausted conservative treatment. Dr. Houchin's expertise is also exhausted at this point, as he is not qualified by either training or experience to render an expert opinion on how a neurosurgeon should proceed after the referral—in other words, to establish the neurosurgeon's standard of care.

¶45   It is true that, during the later course of Dr. Frank's deposition, he opined within an expanded discussion that a neurosurgeon should discuss alternative treatments with referred patients, despite his earlier testimony that a referral meant that alternative treatments had already failed.  However, we have never held that the standard of care can

be established through a defendant's expert and, nationally, courts have resisted doing so. We have explained that the two exceptions to the plaintiff's duty to provide qualified expert testimony regarding a defendant's standard of care are, first, when the conduct complained of is readily ascertainable by a layperson and, second, when a *defendant doctor's* own testimony establishes the standard of care and departure from it. *See Dalton v. Kalispell Regional Hosp.*, 256 Mont. 243, 246, 846 P.2d 960, 961-62 (1993); *Hunter v. Missoula Community Hosp.*, 230 Mont. 300, 305, 750 P.2d 106, 109 (1988).

¶46  "The trial court has broad discretion in determining whether a particular witness is qualified to testify as an expert." *Glover v. Ballhagen*, 232 Mont. 427, 430, 756 P.2d 1166, 1168 (1988); *see also O'Leyar v. Callender*, 255 Mont. 277, 281, 843 P.2d 304, 306 (1992). Given the record, I cannot conclude that the District Court abused its broad discretion in determining that Dr. Houchin was not qualified to testify regarding a neurosurgeon's standard of care. Because the Court's conclusion on this point is central to its reversal under both Issues 1 and 2, I dissent and would affirm the District Court.

/S/ JIM RICE